IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

STELLA LEWIS,                          )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )    CIVIL ACTION NO. 3:09cv337-CSC
                                       )
MICHAEL J. ASTRUE,                     )
COMMISSIONER OF SOCIAL                 )
SECURITY,                              )
                                       )
            Defendant.                 )

**MEMORANDUM OPINION**

**I.  Introduction**

The plaintiff, Stella Lewis ("Lewis"), applied for disability insurance benefits

pursuant to Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*., alleging that she was

unable to work because of a disability.  Her application was denied at the initial

administrative level.  Lewis then requested and received a hearing on January 23, 2006,

before an Administrative Law Judge ("ALJ").  An additional hearing was conducted on

October 23, 2006.  Following the hearings, the ALJ also denied the claim.  The Appeals

Council rejected a subsequent request for review.  The plaintiff subsequently filed a

complaint in this court.  On February 14, 2008, the court granted the Commissioner's motion

to remand pursuant to sentence four of 42 U.S.C. § 405(g).  On March 15, 2008, the Appeals

Council vacated its previous decision and remanded the case to the ALJ for further

proceedings.  (R. 542.)  On September 15, 2008, the ALJ conducted a final hearing.

Following the hearing, the ALJ denied the claim.  The Appeals Council rejected Lewis'

request for review.  The Appeals Council's decision consequently became the final decision

of the Commissioner of Social Security ("Commissioner").[1]  *See Chester v. Bowen*, 792 F.2d

129, 131 (11th Cir. 1986).  The case is now before the court for review pursuant to 42 U.S.C.

§ 405(g) and § 1383(c)(3).  Pursuant to 28 U.S.C. § 636(c)(1) and M.D. Ala. LR 73.1, the

parties have consented to entry of final judgment by the United States Magistrate Judge.

Based on the court's review of the record in this case and the briefs of the parties, the court

concludes that the decision of the Commissioner should be affirmed.

## II.  Standard of Review

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the

person is unable to

> engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result
> in death or which has lasted or can be expected to last for a continuous period
> of not less than 12 months. . . .

To make this determination,[2] the Commissioner employs a five-step, sequential

evaluation process.  *See* 20 C.F.R. § 404.1520, §416.920.

> (1)  Is the person presently unemployed?
> (2)  Is the person's impairment severe?

---

[1] Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commissioner of Social Security.

[2] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

(3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
(4) Is the person unable to perform his or her former occupation?
(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[3]

The standard of review of the Commissioner's decision is a limited one. This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A reviewing court may not look only to those parts of the record which supports the decision of the ALJ but instead must view the record in its entirety and take account of evidence which detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

[The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

---

[3] *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986), is a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See e.g. Ware v. Schweiker,* 651 F.2d 408 (5th Cir. 1981) (Unit A).

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

### III.  Administrative Proceedings

Lewis was 55 years old  at the time of the October 23, 2006, hearing before the ALJ. (R. 476.)  She is a high school graduate.  (R. 477, 505.)  Lewis' prior work experience includes  working as a wood grader, fishing product assembler, and cook.  (R. 107-11, 477, 491-92.) Lewis alleges that she became disabled due to knee and leg problems, depression, migraine headaches, uncontrolled diabetes, skin infections, foot pain, and neuropathy.  (R. 487-89, 493, 499.)   Following the final hearing, the ALJ concluded that Lewis has severe impairments of diabetes mellitus, osteoarthritis in the knees and lumbar spine, and obesity. (R. 520.)  The ALJ determined that Lewis is unable to return to her past relevant work.  (R. 523.)   Based on the testimony of the vocational expert, the ALJ concluded there are a significant number of jobs existing in the national economy that Lewis could perform, including working as a dispatcher, information clerk, and surveillance system monitor.  (R. 19, 524.)  Accordingly, the ALJ concluded that Lewis is not disabled.  (R. 523.)

### IV.  The Issues

In her brief, Lewis raises the following claims:

(1)    The ALJ committed reversible error in failing to comply with the Appeals Council's remand order dated March 15, 2008.

(2)    The ALJ committed reversible error by failing to consult a medical expert regarding the onset date of Lewis' disability.

(3)    The  ALJ's  finding  that  Lewis'  borderline  intellectual

functioning is not a severe impairment and that she has no functional limitations flowing from this impairment is not supported by substantial evidence.

(4)     The Commissioner failed to sustain his burden of establishing whether there is other work in the national economy that Lewis can perform.

(Doc. No. 16-5, Pl's Brief, p. 1.)

## IV.  Discussion

### A.     The Appeals Council

Lewis asserts that the ALJ erred in failing to comply with the Appeals Council's March 15, 2008 order to "specifically evaluate the severity of the claimant's borderline intellectual functioning and if necessary, obtain supplemental evidence from a medical expert and/or vocational expert."  (R. 541-42.)   The failure of an ALJ to take specific action mandated by the Appeals Council on remand is reversible error.  *See Hamilton v. Comm'r of Soc. Sec.*, No. 6:07cv1870-Orl-GJK (M.D. Fla. March 23, 2009); *Tauber v. Barnhart*, 438 F. Supp. 2d 1366 (N.D. Ga. 2006) (quoting 20 C.F.R. 404.977(b)).

This court concludes that the ALJ complied with the Appeals Council's order to specifically evaluate Lewis' intellectual functioning and obtain supplemental evidence from a medical *or* vocational expert.  The record indicates that the Commissioner sent Lewis for an additional consultative examination by Dr. David D. Hall, a psychiatrist, in May 2008. Dr. Hall conducted a psychological evaluation, including sensorium questioning, and determined that Lewis was not more than "moderately impaired in her ability to understand,

remember, and carry out instructions and to respond appropriately to supervision, co-workers, and work pressures in a work setting." (R. 558.)  Additionally, during the hearing September 15, 2008, the ALJ called a vocational expert to testify concerning whether an individual with moderate restrictions would be able to perform work.  The ALJ advised the vocational expert that it was necessary for him to consider both the restrictions set forth in Dr. Jacobs' evaluation and Dr. Hood's report when making his determination and posed the following hypothetical question:

> . . . [T]his time, claimant has . . . a mild restriction as far as responding appropriately to supervisors, a mild restriction as far as responding appropriately to coworkers, has a moderate restriction as far as responding appropriately to customers or other members of the general public.  Using judgment in simple on or two-step work-related decisions, this individual is mild restriction.  As far as using judgment in detailed or complex work related decisions, she has a moderate restriction.  As far as dealing with changes in a routing work setting, the restriction is moderate.  Now as far as the ability to understand, remember, and carry out simple, one, two-step instructions, there is no restriction.  As far as understanding, remembering, and carrying out detailed or complex instructions, there's a moderate restriction.  And as far as maintaining attention, concentration, or pace for periods of at least two hours, there is a moderate restriction.  As far as maintaining social functioning, there is a mild restriction.  As far as maintaining activities of daily living, there is a mild restriction.

(R. 607-608.)  The vocational expert indicated that the aforementioned restrictions would not in any way affect an individual's ability to perform the requirements of a dispatcher, information clerk, or surveillance system monitor "as long as the impairments are not more than moderate."  (R. 608-609.)  All of the medical records, as well as the mental health

experts' opinions in this case, indicate that Lewis has no more than moderate impairments

with respect to her intellectual functioning and other psychological conditions. (R. 407-408,

483-84, 487, 558.)  Because the ALJ further developed the record by ordering an additional

consultative examination by a psychiatrist, called a vocational expert to testify concerning

whether an individual with Lewis' limitations, as identified in both Dr. Jacobs' and Dr.

Hall's evaluations, would be able to perform work, and found that after considering this

additional evidence that Lewis' intellectual functioning was not severe, the court concludes

that the ALJ fully complied with the Commissioner's order to evaluate the severity of the

claimant's borderline intellectual functioning and obtain supplemental evidence from a

medical expert and/or vocational expert.


### B.    Intellectual Functioning

Lewis asserts that the ALJ erred in determining that her borderline intellectual

functioning is not a severe impairment.  Specifically, she contends that the ALJ incorrectly

determined that his finding that her borderline intellectual functioning is non-severe "is

consistent with the testimony provided by Dr. David Blair, Ph.D., an impartial psychological

expert who testified at the initial hearing on January 23, 2006."  Lewis argues that Dr. Blair's

testimony indicates that her intellectual functioning is in the borderline range and that

psychological testing indicated that her "performance was well below average" and "two

standard deviations below the norm." (Doc. No. 16-5, Pl's Brief, pp. 8-9.)  Lewis maintains

that Dr. Blair's testimony supports Dr. Jacobs' finding that she suffers from borderline

intellectual functioning.

The severity step is a threshold inquiry which allows only "claims based on the most trivial impairment to be rejected." *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986). Indeed, a severe impairment is one that is more than "a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." *Bowen v. Yuckert*, 482 U.S. 137, 154 n. 12 (1987) (citing with approval Social Security Ruling 85-28 at 37a).

A physical or mental impairment is defined as "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."   42 U.S.C. § 1382c(a)(3)(c).  The plaintiff has the "burden of showing that [her] impairments are 'severe' within the meaning of the Act."   *McDaniel*, 800 F.2d at 1030-31.   Once the plaintiff establishes that she suffers from a severe impairment, the ALJ is not entitled to ignore that evidence.

On June 1, 2006, Dr. Jacobs conducted a mental health examination, including administering the WAIS-III and MMPI-II.  On the WAIS-III, Lewis obtained a verbal IQ of 74, a performance IQ of 73, and a full-scale IQ of 71.  (R. 405.)  Dr. Jacobs assessed from Lewis' MMPI-II scores that: (1) the L scale or validity scale was slightly above the mean at T 57; (2) the K scale which measures test-taking attitude was below the mean at T 39; (3) Scales 7 and 8 were elevated at T 82 and T 95 respectively, indicating a person with tenuous emotional control; (4) Scale 1 was elevated at T 75, indicating she is very concerned about

her health; (5) Scale 2 was elevated at 74, signaling very significant depression; (6) Scale 3 was elevated at T 79, implying that she tends to internalize her emotions making her more susceptible to psychosomatic ailments, that she may magnify her symptoms in a bid for sympathy, support, or credibility, but that "it does appear that Ms. Lewis' health problems are taking a toll on her emotionally"; (7) the paranoia scale was at T 66, indicating she is suspicious and mistrustful of others and prone to react defensively; (8) the mania scale was relatively high at T 59, indicating a high level of energy, including nervous energy or agitation; and (9) the social introversion scale was at T 64, indicating she is withdrawn socially.  (R. 405.)  Dr. Jacobs' diagnostic impression was major depression, recurrent, moderate; generalized anxiety disorder; pain disorder associated with both psychological factors and general medical condition; rule out breathing related sleep disorder; and borderline intellectual functioning.   (R. 406.)   Dr. Jacobs conclude that Lewis was moderately impaired with respect to her ability to respond appropriately to customers or other members of the general public, use judgment in detailed or complex work-related decisions, deal with changes in a routine work setting, understand, remember, and carry out detailed or complex instructions, and maintain attention, concentration, or pace for periods of at least two hours.

During the hearing before the ALJ, the Commissioner's medical expert, Dr. C. David Blair, testified that Dr. Jacobs' test results were difficult to interpret because "we don't have any of the supplemental scales for it" and "we don't have the best information in here."  (R. 482.)  Dr. Blair also stated there were "some errors" in Dr. Jacobs' report and that the test

results indicate that "[Lewis] also did fairly well in . . . the scales of the WAIS-III suggesting

that her actual[] capability may be somewhat more – not somewhat more, more in at least the

borderline range and I haven't seen it." (R. 483.)  In addition, Dr. Blair testified that Lewis

has "got some fairly decent capabilities, fairly uneven performance and in the absence of

information about why that might be, if there's a neurological problem or some sort of thing

– some such thing, we have to assume that there may have been some variable focus or

attention or effort on the testing.  And I would not, in the absence of other information, I

couldn't endorse this as indicating a low borderline intellectual functioning or certainly not

normal." (R. 483.)

Because Dr. Blair indicated that he could not endorse Dr. Jacobs' findings due to "a

discrepancy between what the degree of dysfunction and what [he] feel[s] the dysfunction

is," the court disagrees with Lewis' characterization that Dr. Blair's testimony was consistent

with Dr. Jacobs opinion that Lewis suffers from borderline intellectual functioning.  The

court does, however, recognize there are some inconsistencies in the mental health

specialists' reports.  For example, Dr. Hall's assessment that Lewis' intellectual functioning

is "average" and Dr. Jacobs' opinion that her intellectual functioning is "borderline" are

inconsistent.  In addition, Dr. Blair's statement that "in the absence of other information, [he]

couldn't endorse [Dr. Jacobs' findings] as indicating a low borderline intellectual functioning

or certainly not normal" is somewhat confusing and contradictory. (R. 483.)  Nonetheless,

the ALJ's failure to reconcile these inconsistencies is harmless in this case.  As previously

discussed, the mental health experts' opinions and other medical records indicate that Lewis

has no more than moderate impairments with respect to her intellectual functioning and other psychological conditions.  (R. 407-408, 483-84, 487, 558.)  As explained above, the ALJ asked the vocational expert to consider the records about Lewis' intellectual ability and properly posed a hypothetical question which included the limitations caused by her intellectual functioning.  This court therefore concludes that any error in the ALJ's determination that Lewis' intellectual functioning is not a severe impairment is harmless.

### C.   The Onset Date

Lewis asserts that the ALJ erred in failing to obtain medical expert testimony to determine whether her borderline intellectual functioning, diabetes, and resulting end organ damage were disabling prior to December 31, 1998.  Specifically, Lewis argues that the ALJ failed to comply with Social Security Ruling (SSR) 83-20.  The Commissioner, however, contends that SSR 83-20 is not applicable because the ALJ found Lewis was not disabled.

SSR 83-20 is inapplicable in this case because the Ruling addresses the circumstance wherein a plaintiff is found to be disabled and the onset date must be inferred.  SSR 83-20 states that "[i]n addition to determining that an individual is disabled, the decision maker must also establish the onset date of disability.  In many cases, the onset date is critical; it may affect the period for which the individual can be paid and may even be determinative of whether the individual is entitled to or eligible for any benefits."  The premise behind the ruling is that an ALJ found the claimant disabled. *Blake v. Massanari*, No. Civ. A. 00-0120-AH-L, 2001 WL 530697, *10 (S.D. Ala. 2001).

> If the ALJ correctly determines that a person was not disabled
> prior to the expiration of their insured status and that decision is
> supported by substantial evidence and proper application of the
> law, and the Appeals Council review of that decision is proper,
> then there is no obligation on the part of the ALJ or the Appeals
> Council to infer a remote onset date of disability because there
> is no disability.

*Blake*, *supra*. *See also Dees v. Astrue*, Civ. Act. No. 08-00667-KD-B, 2010 WL 419415, *3
(S.D. Ala. 2010).

Although Lewis asserts that her borderline intellectual functioning, diabetes, and
resulting end organ damage were disabling prior to December 31, 1998, the medical records
indicate that Lewis' diabetes and its resulting symptoms were not disabling during the
relevant time period.  The medical records indicate that on May 11, 1995, Lewis went to Dr.
Timothy Shaw, a general practitioner, with complaints of "arthritic" pain in her hips and
knees.  (R. 152.)  Dr. Shaw noted that Lewis was "off diet" and suffered from uncontrolled
non-insulin dependent diabetes.  (*Id*.)  Lewis returned to Dr. Shaw's office the following day
with complaints of feeling "a little woozy" and a rash under her right breast.  (R. 151.)  Dr.
Shaw diagnosed Lewis as suffering from non-insulin dependent diabetes and a monilial rash.
(*Id*.)  Dr. Shaw prescribed Lamisil and Glucotrol and stressed that Lewis should watch her
diet.  (*Id*.)  On May 16, 1995, Lewis returned to Dr. Shaw's office complaining of pain in her
hips and knees and reporting that her rash had resolved.  (*Id*.)  Dr. Shaw continued to "really
stress diet."  (*Id*.)  On July 19, 1995, Dr. Shaw noted that Lewis was "upset and crying over
something" that she refused to discuss and was regressively rocking.  (*Id*.)  Dr. Shaw
diagnosed Lewis as suffering from non-insulin dependent diabetes and prescribed Diazepam

and Glucotrol. (*Id*.) On September 28, 1995, Dr. Shaw noted that Lewis was "starting to take diet seriously" and renewed her prescriptions for Diazepam and Glucotrol. (*Id*.)

Lewis returned to Dr. Shaw's office on October 12, 1995, complaining of swelling and pain after dropping a wagon on her right foot. (R. 150.) During a follow-up visit on November 29, 1995, Lewis indicated that she was suffering from shooting pain between the fourth and fifth toes on her right foot, "arthritic" pain running down both legs to her feet, and stiffness in her neck and joints in the morning. (*Id*.) Dr. Shaw diagnosed Lewis as suffering from osteoarthritis. (*Id*.)

Lewis returned to Dr. Shaw's office on April 24, 1996. (R. 150.) Dr. Shaw advised Lewis to lose weight, prescribed Motrin, and diagnosed Lewis as suffering from non-insulin dependent diabetes, osteoarthritis, and morbid obesity. (*Id*.) On May 8, 1996, Lewis went to Dr. Shaw's office with complaints of fullness, low back pain, and increased urination with dysuria. (R. 149.) Dr. Shaw diagnosed Lewis as suffering from diabetes and cystitis, prescribed antibiotics and Glucotrol, and advised her to follow a diet. (*Id*.) Lewis returned to Dr. Shaw with complaints of urinary frequency with dysuria. (*Id*.) Dr. Shaw diagnosed Lewis as suffering from a urinary tract infection and uncontrolled non-insulin dependent diabetes. (*Id*.) Dr. Lewis also emphasized that Lewis should follow a diet and prescribed Augmentin. (*Id*.) On June 20, 1996, Dr. Shaw again diagnosed Lewis as suffering from a urinary tract infection and diabetes, and advised her to lose weight. (*Id*.) On July 8, 1996, Lewis returned to Dr. Shaw's office with complaints of depression, as well as lumbar and lower abdomen pain. (*Id*.) Dr. Shaw diagnosed Lewis as suffering from hemorrhagic

cystitis, advised her to lose weight, and prescribed pain medication, an antibiotic, and Glucotrol. (*Id*.)  On August 30, 1996, and September 4, 1996, Dr. Shaw diagnosed Lewis as suffering from a perirectal abscess with cellulitis and prescribed Augmentin and Lorcet. (R. 148.)

In April 1997, Lewis returned to Dr. Shaw with complaints of a scratchy throat. (*Id*.) Dr. Shaw diagnosed Lewis as suffering from uncontrolled non-insulin dependent diabetes and a history of urinary tract infection and prescribed Glucotrol, Glucophage, and Claritin. (*Id*.)  During an examination on July 15, 1997, Dr. Shaw noted that Lewis was a victim of "repeat domestic violence" and had suffered a contusion to her left leg. (*Id*.)  Lewis also complained of being nervous and "depressed a lot." (*Id*.)  At that time, Dr. Shaw renewed Lewis' prescription for Glucotrol. (*Id*.)  Although Dr. Shaw occasionally renewed Lewis' prescriptions for Glucotrol and other medication, Lewis did not return to the general practitioner for treatment until January 2001. (R. 147.) Pharmaceutical records indicate that Lewis was prescribed Glucotrol on a routine basis from April 1997 through December 1998, as well as after the expiration of the relevant time period. (R. 291-303.)

In addition, Lewis received treatment from Dr. Ronald Agee, a podiatrist, for her complaints of foot pain on several occasions between 1991 and 2004. (R. 194-233.) During the relevant time period, Lewis visited Dr. Agee's office on two occasions. On September 18, 1995, Lewis went to Dr. Agee's office complaining of left heel pain.[4]  Dr. Agee

---

[4] The court notes that Lewis' previous visit to Dr. Agee was over three years earlier on January10, 1992. (R. 227.)

administered an ultrasound of Xylocaine, Marcaine, as well as other topical treatments, and prescribed Dolobid. (R. 197.) Two days later, Lewis returned for a follow up visit reporting that her left heel "was doing better." (*Id*.) Lewis did not seek further treatment from Dr. Agee until several years later. On January 20, 2003, Lewis began complaining of foot numbness. (R. 220.) After conducting an examination, Dr. Agee diagnosed Lewis as suffering from diabetic neuropathy and tarsal tunnel syndrome. (*Id*.)

The medical records indicate that, during the relevant time period, Lewis sought treatment from her treating physicians on a sporadic basis and was not fully compliant with her physician's advice to lose weight or follow a recommended diet. The medical records demonstrate that Lewis' diabetes and resulting symptoms were not disabling between the date of alleged onset, January 1, 1995 and the date Lewis was last insured, December 31, 1998.

The court also concludes that substantial evidence supports the ALJ's determination that Lewis' intellectual functioning is not a severe impairment. I.Q. scores are not necessarily conclusive of borderline intellectual functioning. *See Popp v. Heckler*, 779 F.2d 1497, 1499-1500 (11th Cir. 1986) (ALJ could disregard standardized I.Q. scores which were inconsistent with activities and behavior). "When determining how to give weight to an I.Q. score, it is appropriate to consider medical reports, daily activities, behavior, and other evidence in the record." *Monroe v. Astrue*, No. 4:09cv243-MP-WCS, 2010 WL 2872645, *5 (N.D. Fla. July 20, 2010). As previously discussed, all of the consultative physicians' evaluations and other medical experts' opinions indicate that Lewis has no more than

moderate impairments with respect to her intellectual functioning and other psychological conditions.  (R. 407-408, 483-84, 487, 558.) In addition, Lewis is a high school graduate and her past work was semi-skilled.

Because the ALJ's determination that Lewis' intellectual functioning, diabetes, and resulting symptoms were not disabling prior to December 31, 1998, is supported by substantial evidence, the court concludes that SSR 83-20 is inapplicable as "there is no obligation on the part of the ALJ or the Appeals Council to infer a remote onset date of disability because there is no disability." *Blake*, *supra*.  Consequently, Lewis is not entitled to relief with respect to this claim.

### D.  The Vocational Expert

Lewis asserts that the ALJ's determination that she is able to perform sedentary work as a dispatcher, information clerk, or surveillance monitor is not supported by substantial evidence because the vocational expert misconstrued the Dictionary of Occupational Titles ("DOT") job descriptions.  Specifically, she argues that the jobs of dispatcher and information clerk are defined by the DOT as semi-skilled work.  In addition, she asserts that the vocational expert's testimony that an individual who has a moderate limitation in the ability to perform detailed or complex instructions could perform the three jobs is not consistent with the DOT.  The court concludes that Lewis is entitled to no relief on this basis. The Social Security Administration is not bound by the DOT.  *See Jones v. Apfel*, 190 F.3d 1224, 1230 (11th Cir. 1999) ("[T]he SSA itself does not consider the DOT dispositive.").  The

Eleventh Circuit has held that reliance on the DOT is strictly within the discretion of the ALJ and "an ALJ may rely solely on the VE's testimony." *Id*.  Consequently, Lewis is entitled to no relief.

## V.  Conclusion

Accordingly, the court will enter a separate order affirming the decision of the Commissioner.

Done this 30th day of August, 2010.

        /s/Charles S. Coody
        CHARLES S. COODY
        UNITED STATES MAGISTRATE JUDGE